FILED
2022 Sep-27  PM 02:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **DANIEL HAYES and KATRINA NASH, on behalf of themselves and all others similarly situated,** ) <br> ) <br> ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> **v.** ) <br> ) <br> **AUTOMATION PERSONNEL SERVICES, INC.,** ) <br> ) <br> ) <br> **Defendant.** ) | **Case No.: 2:21-cv-859-AMM** |

| | |
|---|---|
| **TERESA MADKIN, individually and on behalf of similarly situated individuals,** ) <br> ) <br> ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **AUTOMATION PERSONNEL SERVICES, INC.,** ) <br> ) <br> ) <br> **Defendant.** | **Case No.: 2:21-cv-1177-AMM** |

## ORDER

Before the court are motions to dismiss by Automation Personnel Services, Inc. ("Automation") in these consolidated cases. *Hayes* Doc. 16; *Madkin* Doc. 20. For the reasons stated below, Automation's motion to dismiss the *Hayes* action is

**GRANTED** and that case is **DISMISSED WITH PREJUDICE**. Automation's motion for leave to file supplemental authority is **DENIED** as moot. *Hayes* Doc. 24. The Clerk of Court is **DIRECTED** to close the *Hayes* action. Automation's motion to dismiss the complaint in the *Madkin* action is **GRANTED** and Teresa Madkin's claims are **DISMISSED WITHOUT PREJUDICE** to her opportunity to file an amended complaint. Ms. Madkin and Automation are **DIRECTED** to make all future filings using the case style of the *Madkin* action.

## I. BACKGROUND

These cases were consolidated under Federal Rule of Civil Procedure 42(a). Plaintiffs in both cases assert claims for negligence, negligence *per se*, breach of implied contract, and invasion of privacy. *Madkin* Doc. 18; *Hayes* Doc. 1. Additionally, Plaintiffs Daniel Hayes and Katrina Nash ("the *Hayes* plaintiffs") assert a claim for breach of confidence and Ms. Madkin asserts a claim for violation of the Alabama Deceptive Trade Practices Act. The factual allegations in both complaints are materially similar except for certain allegations about Ms. Madkin's alleged damages. Below are the allegations viewed in the light most favorable to Plaintiffs:

Automation is a temporary staffing agency headquartered in Birmingham, Alabama, that hundreds of thousands of individuals have used to obtain employment. *Hayes* Doc. 1 ¶¶ 23, 85. Around 2006, Mr. Hayes obtained

2

employment through Automation, which required him to provide his personally identifiable information ("PII"), including his name and social security number. *Id*. ¶ 62. Around 2016, Ms. Nash obtained employment through Automation, which required her to provide her PII, including her name, social security number, and financial account information. *Id*. ¶ 72. In 2016, Ms. Madkin obtained employment through Automation and provided Automation her social security number, her driver's license number, her date of birth, her home address, her telephone numbers, and "personal identifying information regarding her minor children." *Madkin* Doc. 18 ¶¶ 10, 18. Automation retained Plaintiffs' PII in such a way that their PII was vulnerable to a data breach. *Hayes* Doc. 1 ¶¶ 38-39.

On or before November 17, 2020, a "Data Breach" occurred, "causing the exposure of PII for more than 299,000 individuals" who had "obtained temporary employment through" Automation and had entrusted Automation with their PII. *Id*. ¶¶ 3, 24-25, 32. Plaintiffs' PII was "compromised." *Id*. ¶ 10; *Madkin* Doc. 18 ¶ 20. "[C]ybercriminals" made the data stolen from Automation "freely available [online] in the final week of November [2020]." *Hayes* Doc. 1 ¶ 5 (cleaned up). "Unauthorized individuals can easily access the PII of Plaintiffs" and other victims of the Data Breach. *Id*. ¶ 31. "Once PII is stolen, particularly [a] Social Security number[]," that information may be used to assume a person's identity, ruin their credit, and continue to "damage" them "for years." *Id*. ¶¶ 47, 49.

3

In March 2021, Automation "began notifying Plaintiffs" and state attorneys general of the Data Breach. *Id*. ¶¶ 6-7. Automation sent notices on March 17, 2021, to individuals whose PII had been exposed in the Data breach. *Id.* ¶ 27. Mr. Hayes, Ms. Nash, and Ms. Madkin received these notices. *Id.* ¶¶ 27, 63, 73; *Madkin* Doc. 19 ¶ 20. The notices:

(1) informed recipients that their social security numbers were "potentially accessed" during a "[d]ata [b]reach" involving an "unknown actor";

(2) stated that "law enforcement" has been "notified . . . of this incident"; and

(3) "encourag[ed]" them to follow two pages of advice, including:

    (a) to order their one free annual credit report;

    (b) to either place an "initial" (one-year) or "extended" (seven-year) "fraud alert" on their credit files with "the three major credit reporting bureaus," or place a "credit freeze" on their credit files (which "may delay, interfere with, or prohibit the timely approval of any subsequent request or application [they] make regarding a new loan, credit, mortgage, or any other account involving the extension of credit," and which requires a "photocopy of a government-issued identification card" and a "copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft if [they] are a victim of identity theft"), and

    (c) to "educate [themselves] regarding identity theft . . . by contacting the consumer reporting bureaus, the Federal Trade Commission, or [their] state Attorney[s] General."

*Hayes* Doc. 1-2 at 4-6 (cleaned up).

"After the Data Breach, Mr. Hayes's credit report showed a hospital visit that he did not make and a telephone number that is not his." *Hayes* Doc. 1 ¶ 64. In March

2021, Ms. Madkin's "identity was used to obtain a Chase credit card" and "a debit card was ordered under [her] Wells Fargo bank account without her knowledge." *Madkin* Doc. 18 ¶¶ 22-23. In April 2021, Ms. Madkin received unsolicited applications for various types of credit. *Id*. ¶ 24. In May 2021, Ms. Madkin's children received an unsolicited referral to a nursing home and two bills from a cable service to which they did not subscribe. *Id*. ¶¶ 25-26. Ms. Madkin no longer "receiv[es] certain pieces of mail" and "has been required to change her security information at her bank, her cell phone company, and the Alabama Food Assistance Office." *Id*. ¶¶ 27-28.

"As a result of the Data Breach notice," the *Hayes* plaintiffs "spent time . . . verifying the legitimacy of the Notice of Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring [their] accounts." *Hayes* Doc. 1 ¶¶ 65, 74. The Data Breach "annoy[ed]" and "inconvenience[d]" Plaintiffs and caused them "anxiety" about "the loss of [their] privacy." *Id*. ¶¶ 69, 78. Plaintiffs allege that their PII "remains backed up in [Automation's] possession" and assert an "interest in ensuring that [their] PII . . . is protected and safeguarded from future breaches." *Id*. ¶¶ 71, 80. Plaintiffs further allege that they "suffered . . . damages to and diminution in the value of [their] PII—a form of intangible property that [they] entrusted to [Automation]." *Id*. ¶¶ 68, 77.

5

Mr. Hayes and Ms. Nash sued Automation on behalf of a putative nationwide class of approximately 300,000 "individuals whose PII was accessed during the incident referenced in the Notice of Data Breach." *Id.* ¶ 82. Ms. Madkin sued Automation on behalf of a similar putative class. *Madkin* Doc. 18 ¶ 29. The plaintiffs seek monetary damages, injunctive relief, and attorneys' fees. *Id*. at 22-23; *Hayes* Doc. 1 at 36-40.

Automation moved to dismiss the *Hayes* complaint under Rules 12(b)(1) and 12(b)(6), asserting that the court lacks subject matter jurisdiction because the *Hayes* plaintiffs have not alleged an injury that would give them standing to sue under Article III of the United States Constitution and that even if jurisdiction exists, their complaint fails to state a claim for relief. *Hayes* Doc. 17 at 1-3. Automation requested dismissal with prejudice. *Id*. at 14. The *Hayes* plaintiffs (who are represented by counsel) oppose dismissal, but do not request leave to amend should their complaint fail to state a claim. *Hayes* Doc. 21.

Automation moved to dismiss Ms. Madkin's complaint under Rule 12(b)(6). *Madkin* Doc. 21. Ms. Madkin opposes dismissal and requests leave to file an amended complaint. *Madkin* Doc. 25 at 11 n.4, 21.

Plaintiffs in both cases conceded that their claims for invasion of privacy should be dismissed. *Hayes* Doc. 21 at 14; *Madkin* Doc. 25 at 1.

## II. STANDARD OF REVIEW

"Because a motion to dismiss for lack of standing is one attacking the district court's subject matter jurisdiction, it is brought pursuant to Rule 12(b)(1)." *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 807 n.8 (11th Cir. 1993). "[A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint." *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). "[I]n a factual challenge to subject matter jurisdiction, a district court can consider extrinsic evidence such as deposition testimony and affidavits. In so doing, a district court is free to weigh the facts and is not constrained to view them in the light most favorable to the plaintiff." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1336 (11th Cir. 2013) (cleaned up).

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not make "detailed factual allegations"; its purpose is only to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). To survive a motion to dismiss based on Rule 12(b)(6), a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. But "courts are

not bound to accept as true a legal conclusion couched as a factual allegation," such as the "recitation of [an] element[] of a cause of action." *Id.* (cleaned up).

To test the complaint, the court discards any "conclusory allegations," takes the facts alleged as true, *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018), and "draw[s] all reasonable inferences in the plaintiff's favor," *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). These facts and inferences must amount to a "plausible" claim for relief, a standard that "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

"A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002).

## III. ANALYSIS

### A. Standing

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (cleaned up). "[S]tanding is built on a single basic idea—the idea of separation of

power[]" into judicial, executive, and legislative branches of government. *Id.* (cleaned up); *Muskrat v. United States*, 219 U.S. 346, 354-55 (1911). The Judicial Branch "may resolve only 'a real controversy with real impact on real persons.'" *TransUnion LLC*, 141 S. Ct. at 2203 (cleaned up). "[O]ther governmental institutions" are "more competent" to decide "abstract questions of wide public significance." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

"[J]urisdictional tests, often applied at the outset of a case, should be as simple as possible," *Lozman v. City of Riviera Beach*, 568 U.S. 115, 128 (2013) (cleaned up), and the Supreme Court recently offered a simple standing test, which is to ask of a plaintiff: "'What's it to you?'" *TransUnion LLC*, 141 S. Ct. at 2203 (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)). Put differently, the standing test asks what about "the plaintiff's alleged injury . . . sets him apart from the citizenry at large." 17 Suffolk U. L. Rev. at 881-82.

To the *Hayes* plaintiffs, the standing doctrine poses the question: "What's it to you?" *TransUnion LLC*, 141 S. Ct. at 2203. These plaintiffs allegedly received a notice that (1) informed them that their social security numbers were compromised during a "[d]ata [b]reach" involving an "unknown actor," (2) stated that "law enforcement" has been "notified . . . of this incident," and (3) "encourag[ed]" them to follow two pages of advice, including (a) to order their one free annual credit

report, (b) to either place an "initial" (one-year) or "extended" (seven-year) "fraud alert" on their credit files with "the three major credit reporting bureaus," or place a "credit freeze" on their credit files (which "may delay, interfere with, or prohibit the timely approval of any subsequent request or application [they] make regarding a new loan, credit, mortgage, or any other account involving the extension of credit," and which requires a "photocopy of a government-issued identification card" and a "copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft if [they] are a victim of identity theft"), and (c) to "educate [themselves] regarding identity theft . . . by contacting the consumer reporting bureaus, the Federal Trade Commission, or [their] state Attorney[s] General," *Hayes* Doc. 1-2 at 4-6 (cleaned up).

The *Hayes* plaintiffs pass that test. Indeed, any Automation client who took seriously Automation's notice (let alone followed some or all of Automation's advice) about what to do to protect herself after her PII was compromised might well be confounded that Automation now questions why it matters to her.

The question whether Automation may be liable to the *Hayes* plaintiffs for allegedly compromising their PII is "a real controversy with real impact on real persons." *TransUnion LLC*, 141 S. Ct. at 2203 (cleaned up). Automation does not assert that the controversy is so trivial that it falls below the jurisdictional floor (it was Automation that asserted that the amount in controversy exceeds $5 million,

*Madkin* Doc. 1 ¶ 11), nor that the controversy is so general that it will require the court to decide the kind of "abstract questions of wide public significance" that Article III assigns to other branches of government, *Warth*, 422 U.S. at 500.

An analogy drawn in *TransUnion* illustrates just how straightforward the standing question is in this case. There, it was "as if someone wrote a defamatory letter and then stored it in her desk drawer." *TransUnion LLC,* 141 S. Ct. at 2210. Because there was no "real impact" from the letter, there was no standing. *Id*. at 2203. Here, it is as if the letter were leaked online. *See* Doc. 1 ¶¶ 5, 27, 31; *see also Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1189 (10th Cir. 2014) (Gorsuch, J.) (rejecting a defendant's argument that no real "damage" was done when a "trade secret" was "t[aken] . . . and disclosed" to someone who "could well use the secret").

Shortly before the Supreme Court decided *TransUnion*, the Eleventh Circuit decided two cases about standing in the context of a data breach: *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332 (11th Cir. 2021), and *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247 (11th Cir. 2021), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431 (2021), and *cert. denied sub nom. Watkins v. Spector*, 142 S. Ct. 765 (2022). Those controlling precedents are instructive.

"[F]or a plaintiff to have standing, it must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Tsao*, 986 F.3d at 1337

(cleaned up). "A plaintiff at the pleading stage, as the party invoking federal jurisdiction, bears the burden of establishing these elements by alleging facts that plausibly demonstrate each element." *Id.* (cleaned up).

To plausibly allege the injury element of standing, "a plaintiff must set forth general factual allegations that plausibly and clearly allege a concrete injury, and that injury must be actual or imminent, not conjectural or hypothetical." *Id.* at 1337-38 (cleaned up). The concrete-injury requirement "distinguish[es] a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973). Put differently, a "concrete injury" is something more than a person's "concern" about an issue of public policy or "desire" to "vindicate" a law or the "rights of other[s]." *Diamond v. Charles*, 476 U.S. 54, 65-67 (1986) (cleaned up).

"Typically, tangible injuries" such as economic injuries "are concrete." *Tsao*, 986 F.3d at 1338 (cleaned up). Some concrete injuries may be "more nebulous," such as "lost time," *id.* (cleaned up); "emotional distress," *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1114 n.4 (11th Cir. 2021); *see also TransUnion LLC*, 141 S. Ct. at 2211 (observing that "emotional injury" resulting from "exposure to [a] risk" may be concrete); "reputational harm," *TransUnion LLC*, 141 S. Ct. at 2208; or being "wrongly identified as [a] non-citizen[]" to be investigated for

possible removal from a voting roll, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014).

"[A]ctual identity theft resulting from a data breach" is a concrete injury. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1323 (11th Cir. 2012). But "actual identity theft is by no means required [for standing] when there is sufficient risk of identity theft." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d at 1262. The Supreme Court has long recognized that "one does not have to await the consummation of threatened injury to obtain preventive relief" in a lawsuit. *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (cleaned up) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 591 (1923)); *see also Pennsylvania*, 262 U.S. at 593 (holding that a suit for "an injunction against . . . [conduct] presently threatened and likely to be productive of great injury" was justiciable and different from a mere "abstract ruling on th[e] question" whether conduct was legal); *Meese v. Keene*, 481 U.S. 465, 475 (1987) (recognizing that "the need to take such affirmative steps to avoid the risk of harm to [the plaintiff's] reputation constitutes a cognizable injury" for purposes of standing).

In *Tsao*, the plaintiff's "credit card data . . . may have been accessed by hackers," so he "contacted both [banks] . . . and cancelled his cards." 986 F.3d at 1335. When the plaintiff cancelled his cards, he "lost cash back or reward points, lost time spent addressing the problem[] . . . , and [temporarily suffered] restricted

card access." *Id*. at 1336. The plaintiff brought a class action against the restaurant from whom the hackers may have accessed his credit card information and asserted claims for negligence, breach of contract, and other causes of action. *Id*. at 1335-36. The plaintiff did not allege that "his—or any other class member's—identity was stolen, cards were fraudulently charged, or data was misused." *Id*. at 1336. Nor did the plaintiff allege that he suffered anxiety about the danger that his identity would be stolen. *See id.*; *see also I Tan Tsao v. Captiva MVP Rest. Partners, LLC*, No. 8:18-CV-1606-T-02SPF, 2018 WL 5717479, at *1-2 (M.D. Fla. Nov. 1, 2018) (reciting the plaintiff's allegation that he suffered the "stress, nuisance and annoyance of dealing with" his credit card issuers and the "inconvenience, hassle, and nuisance of monitoring the situation"). Nor did the plaintiff seek injunctive relief. *Tsao*, 2018 WL 5717479, at *1.

The Eleventh Circuit observed that some circuits "recognize[] . . . that a plaintiff can establish injury-in-fact based on the increased risk of identity theft." *Tsao*, 986 F.3d at 1340. For example, the D.C. Circuit held that the plaintiffs had alleged a concrete injury "simply by virtue of [a] hack and the nature of the data that the plaintiffs allege was taken," whether that data included the plaintiffs' social security numbers, or health insurance information, or both. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 628-29 (D.C. Cir. 2017); *but see Reilly v. Ceridian Corp.*, 664 F.3d 38, 40, 43 (3d Cir. 2011) (no standing where "hacker . . . potentially gained access

14

to personal and financial information belonging to . . . approximately 27,000" class members, including their names and social security numbers). The D.C. Circuit held that it was "common sense" "that plaintiffs . . . face a substantial risk of identity theft [when] their social security and credit card numbers [a]re accessed by a network intruder." *Attias*, 865 F.3d at 628. And the Seventh Circuit held that the plaintiffs had alleged a concrete injury when they alleged that a data breach compromised credit card numbers (but not social security numbers), "everyone's personal data . . . [was] stolen," and "9,200 [class members] already ha[d] incurred fraudulent charges" (although all "were later reimbursed"). *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 690, 692 (7th Cir. 2015). The Eleventh Circuit observed that "[g]enerally speaking, the cases conferring standing" involved "at least some allegations of actual misuse or actual access to personal data." *Tsao*, 986 F.3d at 1340.

In *Tsao*, the Eleventh Circuit held that because the plaintiff alleged only "that hackers **may** have accessed and stolen customer credit card data," and did "not allege[] that social security numbers, birth dates, or driver's license numbers were compromised," the plaintiff did not face the kind of "substantial risk of identity theft" that makes an injury concrete. 986 F.3d at 1343 (emphasis in original). Accordingly, the plaintiff could not take advantage of the "voluntary" efforts he made to protect his credit card information, which were "injuries [he inflicted] on

himself." *Id*. at 1343-45. *Tsao* establishes the rule that a bare allegation that a plaintiff's credit card information "may have [been] accessed and stolen" is insufficient to confer standing. *Id*. at 1343-44.

On the other hand, in *Equifax*, the Eleventh Circuit held that a class of data-breach plaintiffs had standing to sue. 999 F.3d at 1263-64. There, the plaintiffs sued Equifax after a data breach compromised their PII. *Id*. at 1257. The plaintiffs alleged that, as a result of the data breach, "hackers obtained . . . 146.6 million names, 146.6 million dates of birth, 145.5 million Social Security numbers, 99 million addresses, 17.6 driver's license numbers, 209,000 credit card numbers, and 97,500 tax identification numbers." *Id.* at 1262. Dozens of the plaintiffs alleged that their identities were stolen. *Id*.

The plaintiffs who had not suffered identity theft relied on a substantial risk theory of standing. *Id.* 1262-63. The Eleventh Circuit held that the "colossal amount of sensitive data stolen" combined with the "unequivocal damage that could be done with [it]" satisfied the injury element of standing. *Id*. The allegations of actual misuse from some of the plaintiffs bolstered the allegations of risk from the plaintiffs who had not suffered identity theft. *Id*. at 1263 (citing *Tsao*, 986 F.3d at 1340).

Plaintiffs' allegations of injury in this case make them more like the plaintiffs in *Equifax* than the plaintiff in *Tsao* for two reasons. *First*, like the PII at issue in *Equifax*, the PII that was allegedly compromised in the Data Breach included names

and social security numbers, *Hayes* Doc. 1 ¶¶ 63, 73; *see also Hayes* Doc. 1-2 at 2, which is the "type of data" with which "unequivocal damage . . . can be done," *Equifax*, 999 F.3d at 1262. The plaintiff in *Tsao*, whose credit card information "may have been" compromised, was able to "effectively eliminat[e]" any risk he potentially faced by cancelling his credit card. 986 F.3d at 1335, 1344. By contrast, the *Hayes* plaintiffs have alleged that the risk they face involves more expansive and ongoing mitigation efforts—the Data Breach requires them to "self-monitor[]" their accounts and caused them to "explor[e] credit monitoring and identity theft insurance options." *Hayes* Doc. 1 ¶¶ 65, 74.

*Second*, Plaintiffs allegedly suffered the kind of "actual misuse" of their PII that the plaintiff in *Tsao* did not allege, *see Tsao*, 986 F.3d at 1340, which suggests that the risk of further misuse and identity theft is substantial enough to satisfy the concrete injury requirement. In *Equifax*, the allegations of "actual identity theft already suffered by some" of the plaintiffs included "numerous unauthorized charges and accounts made in their name." 999 F.3d at 1262-63. Here, Mr. Hayes alleged that "[a]fter the Data Breach, Mr. Hayes's credit report showed a hospital visit that he did not make and a telephone number that is not his." *Hayes* Doc. 1 ¶ 64. Ms. Madkin alleged that her identity was used to obtain a credit card and that she received various other mailings suggesting that her identity is being misused. *Madkin* Doc. 18 ¶¶ 22-27.

17

Moreover, the *Hayes* plaintiffs allegedly experience "anxiety and increased concerns for the loss of [their] privacy," *Hayes* Doc. 1 ¶¶ 69, 78, which is the kind of emotional injury that may be concrete, *TransUnion LLC*, 141 S. Ct. at 2211. The stress of dealing with a tedious process (such as credit card cancellation) is different in kind than "mental distress" caused by exposure to risk, which the common law has recognized as an injury ever "[s]ince the ancient case of the tavern keeper's wife who successfully dodged the hatchet cast at her by an irate customer." Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv. L. Rev. 1033, 1033, 1035 (1936) (citing the 1348 case that recognized the tort of assault)).

And unlike the plaintiff in *Tsao*, the *Hayes* plaintiffs seek preventative, injunctive relief based on Automation's continued possession of their PII, *Hayes* Doc. 1 at 36-39, which is a form of relief that plaintiffs exposed to risks have standing to pursue. *See, e.g., TransUnion LLC,* 141 S. Ct. at 2210; *Farmer*, 511 U.S. at 845; *Meese*, 481 U.S. at 475.

Mr. Hayes and Ms. Nash allegedly "spent time dealing with the" Data Breach, including "verifying the legitimacy of the Notice of Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring [their] accounts." *Hayes* Doc. 1 ¶¶ 65, 74. Ms. Nash has not alleged any actual misuse of her information, but under *Equifax*, Mr. Hayes's and Ms. Madkin's allegations about misuse of their identity "support the sufficiency of [Ms. Nash's] allegations that

[she] face[s] a risk of identity theft" sufficient to confer her standing. 999 F.3d at 1263.

Because the *Hayes* plaintiffs have alleged several kinds of injuries that are sufficient under binding precedent to confer standing to sue—emotional distress, actual identity theft, lost time, and exposure to substantial risk—this court has subject-matter jurisdiction over their case. Accordingly, Automation's motion to dismiss the *Hayes* action pursuant to Rule 12(b)(1) is **DENIED**.

## B. Claims

In Automation's motion to dismiss the *Hayes* action, Automation relied mostly on caselaw from Alabama and asserted that the common law governing Plaintiffs' claims is the same in Alabama and Mississippi. *See Hayes* Doc. 17 at 7, 10, 12, 14. Ms. Madkin and Mr. Hayes live in Alabama; Ms. Nash lives in Mississippi. *Hayes* Doc. 1 ¶¶ 15-16; *Madkin* Doc. 18 ¶ 4. Ms. Nash did not cite any Mississippi cases to support her claims and conceded that the analysis is the same regardless of which state's law applies. *See Hayes* Doc. 21 at 12 n.4. Accordingly, the court analyzes Plaintiffs' claims under Alabama law.

### 1. Negligence and Negligence *Per Se*

"To establish negligence, [a] plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or

injury." *Lemley v. Wilson*, 178 So.3d 834, 841 (Ala. 2015) (cleaned up). Negligence *per se* has the same injury element. *Fox v. Bartholf*, 374 So. 2d 294, 296 (Ala. 1979).

Alabama caselaw has explained what kind of damage or injury is sufficient to satisfy the damage element of a negligence claim. "[P]hysical" or "pecuniary" damage or loss is sufficient. *Wal-Mart Stores, Inc. v. Bowers*, 752 So. 2d 1201, 1204 (Ala. 1999) (defendant negligently caused fire that destroyed car and house); *see also Louisville & N.R. Co. v. Fletcher*, 69 So. 634, 635 (Ala. 1915) (plaintiff could recover "pecuniary" value of baggage negligently lost by railroad). Mental distress is sufficient so long as the distress is accompanied by physical bodily injury or an "immediate risk of physical harm." *Wal-Mart Stores, Inc.*, 752 So. 2d at 1203 (cleaned up) (plaintiff could not recover for mental distress from fire because she was not at risk of physical harm); *accord Phillips v. Delta Motor Lines, Inc.*, 108 So. 2d 409, 415 (Miss. 1959) ("Negligent contact with the person of another, causing no physical damage is not actionable.") (cleaned up).

Mental distress is insufficient if accompanied only by damage to property. *Wal-Mart Stores, Inc.*, 752 So. 2d at 1204 (citing *Louisville & N.R. Co.*, 69 So. at 635). So "the expense and loss of time incurred by [a] plaintiff . . . to see about . . . [her] lost [property], to identify, gather up, and inspect it, or to investigate the damage done" does not satisfy the damage element of a negligence claim. *Louisville & N.R. Co.*, 69 So. at 635. Likewise, the hassle and cost of "more frequent [medical]

monitoring" necessitated by exposure to a long-term physical health hazard does not satisfy the damage element. *Hinton ex rel. Hinton v. Monsanto Co.*, 813 So. 2d 827, 830-31 (Ala. 2001) (plaintiff exposed to carcinogen); *see also id.* at 832 (two justices concurring on ground that injury element of negligence-based claim requires "physical injury").

Automation asserts that the hassle and anxiety that the Data Breach has caused the *Hayes* plaintiffs, *Hayes* Doc. 1 ¶¶ 65, 69, 74, 78, are insufficient to plead the damage element of a negligence claim, *Hayes* Doc. 17 at 9. The court agrees because the hassle and anxiety the *Hayes* plaintiffs allegedly suffered are not related to an actual or immediate risk of physical harm. *See Wal-Mart Stores, Inc.*, 752 So. 2d at 1203; *Hinton ex rel. Hinton*, 813 So. 2d at 831; *Louisville & N.R. Co.*, 69 So. at 635.

Automation also asserts that the plaintiffs' allegations that their identities were misused (Ms. Madkin's identity was used to order credit and debit cards, and she received fraudulent bills, unsolicited applications, and an unsolicited referral, *Madkin* Doc. 18 ¶¶ 22-26, and a hospital visit that Mr. Hayes did not make showed up on his credit report, *Hayes* Doc. 1 ¶ 64) also are insufficient to plead the damage element of a negligence claim because they did not allegedly cause Mr. Hayes and Ms. Madkin to suffer something more than hassle and anxiety, such as "monetary loss." *Madkin* Doc. 21 at 5. The court agrees because Mr. Hayes and Ms. Madkin

did not allege that they lost something physical or of "pecuniary" value when their identities were misused in those ways. *See Louisville & N.R. Co.*, 69 So. at 635.

Ms. Madkin cites a case in which the plaintiffs alleged that tax returns fraudulently filed using their names caused them to "suffer[] quantifiable monetary losses," *Smith v. Triad of Ala., LLC*, No. 1:14-CV-324-WKW, 2015 WL 5793318, at *1 (M.D. Ala. Sept. 29, 2015), but Ms. Madkin did not allege that when her "identity was used to obtain a Chase credit card," she suffered monetary loss, *Madkin* Doc. 18 ¶ 22.

After a hearing on the motions to dismiss, the court ordered supplemental briefing on the kinds of damages that satisfy the damages element in a negligence action under Alabama law. *Hayes* Doc. 33; *Madkin* Doc. 30. In their supplemental brief, the *Hayes* plaintiffs zeroed in on their allegation that they "suffered actual injury in the form of . . . diminution in the value of [their] PII—a form of intangible property that [they] entrusted to [Automation]." *Hayes* Doc. 1 ¶¶ 68, 77. The *Hayes* plaintiffs cited two cases from Alabama appellate courts to support their assertion that the diminished value of intangible property is sufficient to satisfy the damages element of a negligence claim. *Hayes* Doc. 35 at 8-9 (citing *MAT Sys., Inc. v. Atchison Prop., Inc.*, 54 So. 3d 371, 378 (Ala. Civ. App. 2010); and *Empiregas, Inc. of Huntsville v. Simpson*, 549 So. 2d 27, 28 (Ala. 1989)). Alternatively, the *Hayes* plaintiffs assert that "misuse" of information is damage even absent "'any pecuniary

loss,'" because such misuse may support an award for nominal damages. *Hayes* Doc.

35 at 10-11 (quoting *Benson v. Vick*, 460 So. 2d 1309, 1312-13 (Ala. Civ. App.

1984)).

This allegation by the *Hayes* plaintiffs fails to state a claim for damages under

Alabama law for three separate and independent reasons. *First*, the *Hayes* plaintiffs

merely alleged a legal conclusion when they alleged that they "suffered actual injury

in the form of . . . diminution in the value of [their] PII—a form of intangible

property," so that allegation is not entitled to a presumption of truth. *See Twombly*,

550 U.S. at 555. Under Alabama law, damage to personal property is synonymous

with diminishment of its value. *Welch v. Evans Bros. Constr. Co.*, 66 So. 517, 519

(Ala. 1914) (observing that a plaintiff's "damages are the difference in the value of

the goods before and after the injury") (cleaned up); *accord, e.g., Byars v. James*, 94

So. 536, 540 (Ala. 1922); *MAT Sys., Inc.*, 54 So. 3d at 378. So a plaintiff who alleges

that the value of his property has been diminished merely "recit[es] . . . the [damage]

element[] of a cause of action," and the allegation is insufficient to survive a motion

to dismiss. *Twombly*, 550 U.S. at 555.

*Second*, as Automation correctly observes, the *Hayes* plaintiffs did not allege

facts about any pecuniary loss they suffered. *See Hayes* Doc. 36 at 4-5. The *Hayes*

plaintiffs suggest that the "economic benefit [they] derive from being able to

purchase goods and services remotely, without the need to pay by cash or check, has

been diminished due to the data breach," *Hayes* Doc. 35 at 8, but they did not allege how that "diminished . . . economic benefit" caused them to suffer pecuniary harm. For example, the *Hayes* plaintiffs did not allege any out-of-pocket expenses, any monetary loss, or any denial of credit, as a result of the Data Breach.

And *third*, under Alabama law, alleged diminishment in the nonpecuniary value of intangible property does not satisfy the damages element of a negligence claim. The *Hayes* plaintiffs assert that they "need not allege pecuniary harm to state a claim" for negligence because they have alleged a nonpecuniary, intangible injury to property. *Hayes* Doc. 35 at 9-10. Automation responds that that kind of injury is "speculative or contingent," not "actual" damage under Alabama law. *Hayes* Doc. 36 at 6. The court agrees: the *Hayes* plaintiffs' nonpecuniary damage to intangible property is not a viable claim under Alabama precedents on negligence. As discussed *supra*, pp. 20-21, when it comes to damages for negligence, Alabama precedents distinguish between the tangible and intangible, and the pecuniary and non-pecuniary. Intangible, nonpecuniary forms of harm are actionable damages for negligence only under limited circumstances, and the Hayes plaintiffs' allegations have not alleged such circumstances. *See Wal-Mart Stores, Inc.*, 752 So. 2d at 1203-04; *Hinton ex rel. Hinton*, 813 So. 2d at 831; *Louisville & N.R. Co.*, 69 So. at 635.

Despite supplemental briefing, the *Hayes* plaintiffs failed to cite binding precedent suggesting that the diminution in value or usefulness of intangible

24

property satisfies the damages element of their negligence claim. The cases the *Hayes* plaintiffs cited are inapposite because damage occurred to tangible property in those cases. *See MAT Sys., Inc.*, 54 So. 3d at 373-74 ("'custom-manufactured' commercial office" products had to be stored offsite after water damage); *Empiregas, Inc. of Huntsville*, 549 So. 2d at 28 (damage from "loss of personal property in a tool shop fire caused by a malfunctioning liquified gas tank regulator"). They do not support the *Hayes* plaintiffs' novel contention about intangible property.

The *Hayes* plaintiffs argue in the alternative that they need not allege "pecuniary loss" because they may request "nominal damages" under *Benson*. *Hayes* Doc. 35 at 11 (cleaned up). The plaintiffs in *Benson* were passengers in a car accident caused by the defendant's negligence. 460 So. 2d at 1311. The jury awarded some passengers significant damages for physical injury and mental distress, but awarded one dollar to the infant passenger. *Id*. There was conflicting evidence about whether the infant was injured. *Id*. at 1312. On appeal, the Alabama Court of Civil Appeals rejected the infant's argument that the one-dollar award was inadequate, observing that "[w]hen a plaintiff fails to prove any pecuniary loss or actual damages, he is entitled to recover . . . nominal damages." *Id*. at 1312-13. To support that observation, the court cited a case involving a nominal damages award for "trespass of the person and assault and battery." *Williams v. Clark*, 279 So. 2d 523, 525 (Ala. Civ. App. 1973) (offensive touch on the hand).

25

Nominal damages recognize a "fail[ure] [of] pro[of]" at trial. *Benson*, 460 So. 2d at 1311-12; *Roberson v. C.P. Allen Constr. Co.*, 50 So. 3d 471, 479-80 (Ala. Civ. App. 2010) (observing that nominal damages are awarded when "no actual damages have been proven"). The availability of nominal damages upon such failure of proof does not mean that a plaintiff is relieved of the requirement to plead actual damages. Indeed, if *Benson* stood for the broad proposition for which the Hayes plaintiffs cite it, it would be in tension with the rule that "the fourth element of a cause of action for negligence, actual loss or damage, requires more than nominal damages." *Matthews Bros. Constr. Co. v. Stonebrook Dev., L.L.C.*, 854 So. 2d 573, 578 (Ala. Civ. App. 2001) (cleaned up), *aff'd on other grounds sub nom. Ex parte Stonebrook Dev., L.L.C.*, 854 So. 2d 584 (Ala. 2003). It would also be in tension with subsequent Alabama Supreme Court precedent *supra*, pp. 20-21, that distinguish between tangible and intangible harm and pecuniary and nonpecuniary loss in negligence cases.

Plaintiffs also cite a federal decision, *Standifer v. Best Buy Stores, L.P.*, 364 F. Supp. 3d 1286 (N.D. Ala 2019), and assert that the nonphysical "consequences" of the Data Breach are sufficient to plead the damage element of a negligence claim, *Hayes* Doc. 21 at 10; *Madkin* Doc. 25 at 11. But Plaintiffs overread *Standifer*, which involved distinct circumstances not present here. In *Standifer*, the defendant allegedly caused the plaintiff's "potentially confidential data" on her computer to be

26

accidentally "viewed" by three "unauthorized" but innocent people, who voluntarily notified the plaintiff of the problem. 364 F. Supp. 3d at 1308-09. The plaintiff allegedly spent "many unbilled hours" informing her business clients, the state, and the IRS of the data breach, and responding to a client's request about the data breach. *Id.* at 1293-94. The plaintiff's claims for breach of fiduciary duty, conversion, fraud, and negligence survived summary judgment. *Id.* at 1297-98, 1300, 1307.

The *Standifer* court held that the "work" the plaintiff did at the request of her client, and the "time and expense" she undertook to inform the state and the IRS of the breach, was a cognizable injury that could support her negligence claim. *Id.* at 1309. Put differently, the plaintiff in *Standifer* lost something of pecuniary value as a result of the data breach: professional, unbilled time. This case is distinguishable from *Standifer* because Plaintiffs have not alleged that Automation's negligence required them to perform uncompensated extra work on behalf of clients, or alleged any other monetary loss.

Ms. Madkin makes two additional arguments about her alleged damages. *First*, Ms. Madkin asserts that because her allegations about her damages give her standing to sue, they are also sufficient to plead the damages element of a negligence claim. *Madkin* Doc. 25 at 7-8. That argument fails because the requirements for standing under Article III are more lenient than the requirements to plead the damage element of a claim for negligence under Alabama law. *Compare TransUnion LLC*,

27

141 S. Ct. at 2211 (emotional distress may be sufficient to impart standing), *and Sierra*, 996 F.3d at 1114 n.4 (same), *with Wal-Mart Stores, Inc.*, 752 So. 2d at 1204 (emotional distress unrelated to risk of physical injury may be sufficient to satisfy the damages element for trespass, but not for negligence). That Ms. Madkin's alleged damages give her Article III standing to assert a claim against Automation does not establish that her allegations are sufficient to state a claim for relief for negligence under Alabama law.

*Second*, Ms. Madkin asserts that "a general allegation in the prayer for relief that the Plaintiff suffered damages as a result of the Defendant's wrongful conduct is sufficient for purposes of alleging the 'damages' element of a cause of action." *Madkin* Doc. 25 at 8-9. Relatedly, Ms. Madkin asserts that her general allegation that she suffered "identity theft" is sufficient to plead damages. *Madkin* Doc. 25 at 11; *see also Madkin* Doc. 18 ¶ 21 (alleging that "her identity had been stolen"). Those arguments fail because "specific allegations of what the . . . damage consisted of govern over the general allegation that there was . . . damage." *SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London*, 32 F.4th 1347, 1362 (11th Cir. 2022) (cleaned up). "[T]aking the allegations of a complaint as true does not require [a court] to ignore specific factual details of the pleading in favor of general or conclusory allegations." *Id*. (cleaned up). Ms. Madkin made specific factual allegations about her damages, *Madkin* Doc. 18 ¶¶ 22-28, but those kinds of damages

do not satisfy the damages element of a negligence claim under Alabama law, so her general allegation that she suffered damage and identity theft do not rescue her claims in Counts I and II from dismissal.

Plaintiffs failed to state a claim for negligence and negligence *per se*. Accordingly, those claims are **DISMISSED**.

### 2. Breach of Implied Contract

"The basic elements of a contract" and "an implied contract" are the same: "an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement." *Stacey v. Pead*, 142 So. 3d 529, 531 (Ala. 2013) (cleaned up). An implied contract is different from an ordinary contract "only in the method of expressing mutual assent." *Ellis v. City of Birmingham*, 576 So. 2d 156, 157 (Ala. 1991) (cleaned up). "Implied contracts normally arise in situations where there is a bargained-for exchange contemplated by the parties, but no overt expression of agreement." *Id*.

In *Berry v. Druid City Hospital Board*, 333 So. 2d 796 (Ala. 1976), the plaintiff alleged that she "was accepted in the emergency room for treatment and that such treatment was not forthcoming" because she was "left . . . on a stretcher unattended." *Id*. at 801-02. The court held that those allegations were sufficient to plead "an implied contract, via the defendant's conduct in accepting the plaintiff for treatment, to give her attention while on the stretcher, on the treatment table in the

emergency room, and that the breach of this contract caused the plaintiff damage." *Id*. at 802.

In *Steiger v. Huntsville City Board of Education*, 653 So. 2d 975 (Ala. 1995), the plaintiff asserted that a contract to keep him safe from third party criminal conduct could be implied from his employer's written policy, which stated that the employer "strives to maintain safe buildings," requires "[p]roper supervision of students," and keeps "a closed campus policy." *Id*. at 977 (cleaned up). The plaintiff sued after he was assaulted on campus by four students and a nonstudent. *Id*. at 976. The court observed that "[i]t is difficult to impose liability on one person for an intentional criminal act committed by a third person" and held that there was a clear "absence of those elements necessary to create a contract, either express or implied in fact, for the [employer] to protect [the plaintiff] from the criminal actions of third parties." *Id*. at 978 (cleaned up).

Plaintiffs alleged that Automation "required [them] to provide their personal . . . and financial . . . information" to Automation and that "[i]n so doing," Automation implicitly "agreed to safeguard and protect such information" and to "timely notify" them if a data breach occurred. *Hayes* Doc. 1 ¶¶ 133-34; *Madkin* Doc. 18 ¶ 72 (same). Automation asserts that those allegations are conclusory because merely requiring someone to provide information is not an implicit

expression of assent to the terms of a contract imposing "obligations related to data security." *Hayes* Doc. 17 at 11. The court agrees with Automation.

Under *Berry*, a temporary staffing agency's acceptance of information from a job applicant could imply some sort of agreement to engage in employment-related services. 333 So. 2d at 801 (agreement to provide medical services implied from a hospital's acceptance of a patient into an emergency room). But *Steiger* is the better analogue: there, a defendant's written policies about maintaining safety on campus did not imply an agreement to keep its employee safe from third-party criminal activity. 653 So. 2d at 978. Under *Steiger*, Plaintiffs' allegations are insufficient to plead that Automation entered into an implicit contract with them pertaining to the safekeeping of their information from criminal third-parties and/or the protocol for notification if such criminal activity occurs.

Plaintiffs cite *Sackin v. TransPerfect Global, Inc.*, 278 F. Supp. 3d 739 (S.D.N.Y. 2017), but that case is unlike this one, is not binding precedent, and is in tension with *Steiger*. In *Sackin*, the plaintiffs alleged that the defendant's "privacy policies and security practices manual . . . state[d] that the company 'maintains robust procedures designed to carefully protect the PII with which it is entrusted.'" 278 F. Supp. 3d at 750. The court held that the employer's "receipt of Social Security numbers or other sensitive personal information" from the plaintiffs necessarily "impl[ied] [the employer's] assent to protect the information sufficiently" from

"hackers." *Id.* at 751 (cleaned up). Here, Plaintiffs did not allege that Automation had a written policy stating that it had procedures designed to protect the information they provided. *See Hayes* Doc. 1 ¶¶ 133-138; *Madkin* Doc. 18 ¶¶ 71-73. But even if Plaintiffs had alleged that Automation had such a policy, it is questionable whether that allegation would be sufficient under *Steiger* to state a cause of action for implied contract when the harm was caused by third-party criminal conduct.

Plaintiffs failed to state a claim for breach of implied contact. Accordingly, their claims for breach of implied contract are **DISMISSED**.

### 3. Invasion of Privacy

Plaintiffs asserted claims for invasion of privacy. *Madkin* Doc. 18 ¶¶ 76-87; *Hayes* Doc. 1 ¶¶ 139-51. In response to Automation's Motion to Dismiss, Plaintiffs conceded that those claims should be dismissed. *Hayes* Doc. 21 at 14; *Madkin* Doc. 25 at 1. Accordingly, those claims are **DISMISSED**.

### 4. Breach of Confidence

The *Hayes* plaintiffs styled their claims in Count IV as claims for "Breach of Confidence." *Hayes* Doc. 1 ¶¶ 152-64. The allegations in that count are materially indistinguishable from the *Hayes* plaintiffs' allegations in Counts I and II for negligence and breach of implied contract. For example, the *Hayes* plaintiffs allege in Count IV that they "provided their PII to [Automation] with the explicit and implicit understandings that [Automatic] would protect and not permit the PII to be

disseminated to any unauthorized third parties" and that "[d]ue to [Automation's] failure to prevent and avoid the Data Breach from occurring, [their] PII was disclosed." *Id.* ¶¶ 155, 158. The *Hayes* plaintiffs also allege in Count IV that Automation "knew or should have known its methods of accepting and securing [their] PII was inadequate" and that the Data Breach was "reasonably foreseeable." *Id.* ¶ 161.

Automation asserts that Count IV must be dismissed because Alabama and Mississippi have not "recognize[d] breach of confidence as an independent cause of action." *Hayes* Doc. 17 at 14. The *Hayes* plaintiffs concede that they are "not aware of any Alabama or Mississippi cases" recognizing breach of confidence as a claim distinct from breach of implied contract or negligence, but assert that "[w]hether . . . a confidential relationship existed by virtue of the parties' relationship to each other should be a factual question for the jury." *Hayes* Doc. 21 at 14-15.

Whether a confidential relationship existed may be a question of fact applicable to some kind of claims, but that does not rescue the *Hayes* plaintiffs' claims in Count IV. When "a confidential relationship" exists, it may give rise to a "duty to disclose" (or a fiduciary duty), the breach of which may give rise to a claim for "fraudulent suppression" (or breach of fiduciary duty). *Ex parte Farmers Exch. Bank*, 783 So. 2d 24, 27 (Ala. 2000); *see also Stone v. Gulf Am. Fire and Cas. Co.*, 554 So. 2d 346, 359 (Ala. 1989); *Landis v. Neal*, 374 So. 2d 275, 281 (Ala. 1979)

(referring to claims of "fraud, violation of confidence or of fiduciary duty"). But the *Hayes* plaintiffs have not pleaded claims that sound in fraud or implicate fiduciary duties; rather, their claims in Count IV sound in breach of contract and negligence.

"In determining the nature of a cause of action, th[e] [c]ourt looks to allegations in the body of the complaint, not the caption or label the party applies." *Elizabeth Homes, L.L.C. v. Cato*, 968 So. 2d 1, 8 (Ala. 2007). "The substance of the plaintiff's allegations control, not the effort given by the plaintiff to style the claims . . . ." *Id*. For example, when a plaintiff's claims arise under an agreement and "are essentially claims of a breach of th[at] . . . agreement styled as tort claims," the court may ignore the "tort" label that the plaintiff assigns to those claims and treat the claim as one for breach of contract. *Id*. at 10.

The *Hayes* plaintiffs' claims in Count IV are essentially claims for breach of implied contract and/or negligence, which fail for the reasons already discussed. Accordingly, Count IV of the *Hayes* complaint is **DISMISSED**.

### 5. Alabama Deceptive Trade Practices Act

Ms. Madkin asserted a claim for violation of the Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code § 8-19-5(7). *Madkin* Doc. 18 ¶¶ 55-69. That subsection of the ADTPA prohibits "[r]epresenting that . . . services are of a particular standard, quality, or grade . . . , if they are of another." Ala. Code § 8-19-5(7). The ADTPA provides that "[a]ny person who commits one or more of

the acts or practices declared unlawful . . . and thereby causes monetary damage to a consumer . . . shall be liable to each consumer . . . for: (1) [a]ny actual damages sustained by such consumer or person, or the sum of $100, whichever is greater; or (2) [u]p to three times any actual damages . . . ; and (3) . . . the costs of the action or counterclaim, together with a reasonable attorney's fee." *Id.* § 8-19-10(a).

Ms. Madkin alleged that she "entered into an agreement with [Automation] for . . . employment placement services," that she "provided [Automation] with [her] PII," that Automation "owe[d] duties of care to [her] that require it to adequately secure PII," and that "[h]ad [she] known the truth that [Automation] took inadequate measures to protect their PII, [she] would have acted differently." *Madkin* Doc. 18 ¶¶ 57, 61, 63. As discussed *supra*, pp. 21-22, Ms. Madkin alleged that she suffered hassle and anxiety because of the theft of her identity, but not that she suffered monetary damage. *Madkin* Doc. 18 ¶¶ 22-28; *see also Madkin* Doc. 25 at 8-9 (asserting that she need not "allege a monetary loss" to state a claim for negligence). Ms. Madkin conceded in her opposition to her motion to dismiss that Automation did not "specifically articulate[]" that its services were of a "particular standard, quality, and/or grade," but she asserted that "when [Automation] was retained as to find employment for [her], [Automation] assured [her] that it owed duties of care to [her] that required it to adequately secure [her] PII." *Madkin* Doc. 25 at 16.

Automation moved to dismiss Ms. Madkin's ADTPA claim on the ground that Ms. Madkin "has not alleged that she has suffered any monetary damages." *Madkin* Doc. 21 at 9.[1] Ms. Madkin did not respond to Automation's argument. *See Madkin* Doc. 25 at 15-19. Accordingly, Ms. Madkin's claim for violation of the ADTPA is **DISMISSED**.

## IV. CONCLUSION

For the foregoing reasons, Automation's motions to dismiss are **GRANTED**. Automation requested dismissal with prejudice, and the *Hayes* plaintiffs, who are represented by counsel, did not request leave to amend their complaint should their claims be dismissed. Accordingly, the *Hayes* action is **DISMISSED WITH PREJUDICE**. Ms. Madkin requested leave to file an amended complaint. Accordingly, Ms. Madkin's claims are **DISMISSED WITHOUT PREJUDICE** to her opportunity to file an amended complaint consistent with this order.

**DONE** and **ORDERED** this 27th day of September, 2022.



**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

---

[1] Automation moved to dismiss on the alternative ground that that Ms. Madkin "is not a 'consumer' as that term is defined under the DTPA," *Madkin* Doc. 21 at 9, but because her ADPTA claim fails on another basis, the court need not analyze that alternative ground.